## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 19-13035 |
| | § | |
| BRANDIN G. LEARSON, | § | SECTION A |
| | § | |
| DEBTOR | § | CHAPTER 13 |

## <u>MEMORANDUM OPINION AND ORDER</u>

This Court held an evidentiary hearing (the "<u>Hearing</u>") to consider the *Debtor's Motion for Order Compelling Disgorgement of Fees* (the "<u>Motion To Disgorge Fees</u>"), [ECF Doc. 130], filed by Brandin Learson ("<u>Learson</u>" or, post-petition, the "<u>Debtor</u>"), and the Opposition to the Motion To Disgorge Fees filed by Sandler Michaud, LLC (the "<u>Firm</u>"), [ECF Doc. 183]. The Debtor, now represented by different counsel, alleges that the Firm failed to perform promised legal services which resulted in this Court issuing an Order converting the Debtor's case from chapter 13 to one under chapter 7. The Debtor seeks disgorgement of fees paid to the Firm because "no legal services of substance were provided." Motion To Disgorge Fees, ¶ 12.

At the Hearing, the Court heard testimony from the Debtor, Natausha Gaudin, Sharry Sandler, and Marc Michaud. The Court admitted into evidence the following exhibits: Debtor Exhibits A–L and Firm Exhibits A–B. At the conclusion of the Hearing, the Court took the matter under advisement.

After considering the evidence presented, the arguments of the parties, the record as a whole, and the applicable legal authority, the Court **GRANTS** the Motion To Disgorge Fees and orders disgorgement of attorneys' fees in the amount of $9,000.

**JURISDICTION AND VENUE**

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matter presently before the Court constitutes a core proceeding that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(A). The venue of the Debtor's chapter 13 case is proper under 28 U.S.C. § 1408.

**FINDINGS OF FACT**

**A.      The Parties**

Learson owns and operates a variety of small businesses, including fitness and construction businesses, through various limited liability companies of which he is the member-manager. *See* Hr'g at Min. 9:03–:06; 10:55; Debtor Ex. D. Natausha Gaudin ("Gaudin"), who has power of attorney to make decisions about Learson's property and finances, assists him in operating the businesses. *See* Hr'g at Min. 9:03–:06; 10:55; Debtor Exs. B–D.

The Firm is owned and operated by two attorneys: Sharry Sandler ("Sandler") focuses her practice on consumer bankruptcy and Marc Michaud ("Michaud") practices general litigation. *See* Hr'g at Min. 9:02–:05; 10:05–:39.

**B.      The Firm's Representation of Learson, His Affiliated Companies, and Gaudin**

On October 31, 2019, Learson retained Michaud to defend one of Learson's companies, Bellus Development Group, LLC ("Bellus"), against a pending foreclosure suit (the "Foreclosure Action") and executed a retention agreement by which Learson paid a flat fee of $2,500 and promised to pay 33% of any amount recovered under a theory of unfair or wrongful debt collection practices. *See* Hr'g at Min. 9:03:45; 9:04:22; Debtor Ex. L.

Earlier that year, in January 2019, a lawsuit was filed in state court against Learson, Gaudin and Bellus, asserting fraud claims related to ownership of assets transferred to Bellus (the "Fraud

Case"). [Adv. No. 20-1011, Ex. 1]. In December 2019, counsel representing those defendants withdrew and, in January 2020, Michaud substituted as counsel for all of the defendants. *See* Hr'g at Min. 10:05:20–:09:50. Michaud testified that he worked primarily with Gaudin on the defense of the Fraud Case and filed motions for extensions of time in that case. *See id*. No written retention agreement was executed for this representation, but on January 22, 2020, Michaud accepted a $4,000 fee, of which he testified that $2,000 would be used to defend the Fraud Case and $2,000 would be used to assess and file adversary proceedings in Learson's personal bankruptcy case to tee up the claims alleged in the Fraud Case in that forum. *See id.*; Debtor Ex. G.[1] Michaud filed no adversary proceedings in the bankruptcy case, and on March 19, 2020, the Firm refunded $2,000 to the Debtor. *See* Debtor Ex. I; Hr'g at Min. 10:06:23; 10:14:00–:15:40.[2]

On January 17, 2020, Learson retained Michaud on behalf of another of his affiliated companies, Innovative Fitness LLC, to defend an eviction action filed by Hyde Park Plaza, L.L.C. (the "Eviction Action"). *See* Hr'g at Min. 10:07–:09:16; 10:33:31–:47; Debtor Ex. K. A $1,000 fee was paid from Innovative Fitness's account, *see* Debtor Ex. K, but Michaud testified that he accepted an additional $1,000 cash payment for the representation as well, *see* Hr'g at Min. 10:05:20–:09:50. No written agreement was executed by the parties for this representation. *See* Hr'g at Min. 10:09:59–:10:18

Michaud testified that he has represented Learson, Gaudin, and/or Learson's affiliates in six separate matters, but executed retention agreements in only two of them. *See* Hr'g at Min.

---

[1]     Gaudin's testimony on this point is unreliable. She testified both that $4,000 was intended to be used solely for analyzing and filing adversary proceedings and that the fee would be split between defense of the Fraud Case and filing of adversary proceedings. *See* Hr'g at Min. 10:59:30–11:00:13.

[2]     Rather, on February 13, 2020, the plaintiffs who initiated the state court Fraud Case filed an adversary proceeding pursuant to 11 U.S.C. § 523, objecting to the dischargeability of any debts owed to them by Learson and alleging the same facts as they alleged in the Fraud Case. [Adv. No. 20-1011, ECF Doc. 1].

10:05:20–:16:05.  Michaud also testified that the Firm treated Learson, Gaudin, and Learson's closely held companies as "effectively one unit" and the problems facing that group as "interchangeable," explaining that the Firm aimed to save the entire enterprise.  *See* Hr'g at Min. 10:05:20–:13:03.  Michaud further testified that he was unaware prior to the Hearing of the provisions for retention of estate professionals under the Bankruptcy Code and Bankruptcy Rules, *see* Hr'g at Min. 10:08:20–:08:26, and that he "[hadn't] kept a time sheet since 2009," *see* Hr'g at Min. 10:11:53–:12:00.

### C. The Firm's Representation of Learson in His Consumer Bankruptcy Case

A week after the Firm was retained to represent Bellus, Learson retained Sandler on November 6, 2019, to file an individual chapter 13 bankruptcy petition for him personally.  *See* Debtor Ex. A.  The parties executed a written retention agreement, which outlines the terms of the engagement between Learson and Sandler (the "Fee Agreement").  *See id.*  Per the Fee Agreement, Learson paid Sandler a flat fee of $2,500 for legal services to file and manage his chapter 13 bankruptcy case.  *See id.*; *see also* Hr'g at Min. 9:27–:29.  The agreement specified the services that Sandler would provide:

a.    Preparation and electronic filing of petition, schedules, supplemental local forms, Chapter 13 plan, mailing matrix, and means test;

b.    Drafting and mailing to you a letter regarding your attendance at the 341 Meeting of Creditors and what you need in preparation;

c.    Preparation and attendance at the 341 Meeting of Creditors;

d.    Preparation and attendance at the Hearing on Confirmation of your Chapter 13 Plan;

e.    Review of documents and timelines needed in order to prevent automatic dismiss [*sic*] of your case;

f.    Maintaining custody and control od [*sic*] case files for five years from today;

g.      Service of orders on all affected parties;

h.      Defending objections to confirmation of your Chapter 13 Plan;

i.      Give information concerning credit counseling options pre-petition and explaining those requirements under the Bankruptcy Code;

j.      Determine the amount if [*sic*] Adequate Protection payments to be paid pre-confirmation to the secured creditors and facilitate these payments being made;

k.      Provide all required notices and instructions to the client up to confirmation.

Debtor Ex. A, at 1.  The Fee Agreement also identified services that would not be included in the base fee of $2,500, but would cost additional legal fees, such as filing motions to sell property, defense against a motion by a creditor to terminate the automatic stay on property, or filing a motion to convert the case to one under chapter 7 of the Bankruptcy Code.  *See* Debtor Ex. A, at 2.  Sandler failed to file within fourteen days of the Order for Relief a disclosure of compensation into the record as required by 11 U.S.C. § 329, Bankruptcy Rule 2016(b), and this Court's governing presumptive-fee Order.

On the same day that Learson signed the Fee Agreement, Sandler worked with Gaudin to sort through the Debtor's financial documents.  *See* Hr'g at Min. 9:03–:06.  At that time, Sandler possessed the Debtor's name, address, social security number, information on the Debtor's businesses and the properties owned by those businesses (including Bellus), and a list of creditors—all obtained through Michaud's defense of Bellus in the pending Foreclosure Action. *Id.*

1.  *The Debtor's bankruptcy filing*

On November 7, 2019, Sandler filed a chapter 13 voluntary petition on Learson's behalf. [ECF Doc. 1].  The Petition reflected the Debtor's residential address, but designated his "mailing address" as:  Bellus Development Group, 201 St. Charles Avenue, Suite 114-159, New Orleans,

LA 70170. [ECF Doc. 1]; Hr'g at Min. 9:17–:18. That designation resulted in the inclusion of "Bellus Development Group" on the automatically generated *Notice of Bankruptcy Case Filing*. [ECF Docs. 5 & 10]. Immediately upon the filing of the Petition, creditor Six C Investment, LLC ("Six C"), a secured lender holding a mortgage on property belonging to Bellus, filed a *Motion To Determine Applicability of Stay* because the scheduled foreclosure sale on that property had been interrupted by the filing of the Debtor's bankruptcy petition. [ECF Doc. 3]. In that motion, Six C attached documentation from the Louisiana Secretary of State's Web site showing the Debtor to be Bellus's member-manager and quitclaim deeds demonstrating Bellus's ownership of the property at issue. Six C alleged that "[c]ounsel for Brandin Gregory Learson has contacted the Sheriff for the Parish of Orleans in an attempt to have the sale for the property owned by Bellus Development Group, LLC cancelled as a result of the filing of the bankruptcy of Brandin Gregory Learson." [ECF Doc. 3, ¶ VI; ECF Doc. 25]. After notice and hearing, the Court issued an Order confirming that the provisions of 11 U.S.C. § 362(a) did not apply to property held by non-debtor Bellus. [ECF Doc. 36].

At the Hearing on the Motion To Disgorge Fees, Sandler initially testified that including Bellus's address on the Debtor's bankruptcy petition was harmless and "merely a mailing issue." Hr'g at Min. 9:19:24–:20:51. But Sandler's further testimony reveals that the inclusion of Bellus's name on the *Notice of Bankruptcy Case Filing* may not have been an inadvertent mistake, as she testified that she filed the Debtor's personal bankruptcy on the premise that "Learson was a co-debtor equally with Bellus and that we could stop the sale on behalf of Mr. Learson not on behalf of Bellus." Hr'g at Min. 9:23:10–:23:35. Sandler also testified that she gave Gaudin a copy of Learson's *Notice of Bankruptcy Case Filing* with Bellus's name on it and that Gaudin took that

6

notice to the sheriff's office on the day of the scheduled foreclosure sale of Bellus's property. *See* Hr'g at Min. 9:18:18–:20:51.

### 2. Sandler's management of the Debtor's bankruptcy case

Pursuant to Rule 3015(b) of the Bankruptcy Code, the Debtor's bankruptcy Schedules and a Plan of Reorganization were due on November 21, 2019, fourteen days after the filing date. The Debtor gave Sandler documents required to complete the Schedules and formulate a Plan, including copies of his wage information for the six months leading up to the bankruptcy filing, copies of his monthly living expenses, and his credit reports. *See* Hr'g at Min. 9:05:55–:06:12; 10:35:50–:36:56. He submitted those documents through Gaudin soon after Sandler's request. *See* Hr'g at Min. 10:36:21.

On November 14, 2019, Gaudin delivered additional documents to Sandler, including

a spreadsheet of . . . Mr. Learson's itemized debt . . . income information from his multiple businesses and personal income, with all of . . . [the] contact information to support what was provided to [Sandler] in the initial filing, as well as a listing of . . . all lawsuits and any potential lawsuits, every single asset that Mr. Learson owned personally as well as his three businesses and all of the backup information with that.

Hr'g at Min. 10:52:27–:53:27; Debtor Exs. B–C. The Debtor did not provide his 2018 tax returns because they had not yet been filed. *See* Hr'g at Min. 10:37–:38. Sandler never asked the Debtor to produce additional documents; however, in early December 2019, Gaudin and the Debtor provided corrections and updated information to documents they had previously submitted. *See* Hr'g at Min. 10:35–:38; 10:54; 11:06–:08; Debtor Ex. E.

Sandler did not file a motion for an extension of time to file the Debtor's Schedules, but admitted at the Hearing that she should have. *See* Hr'g at Min. 9:11:28–:12:08. Sandler testified that she has a policy to not file for extensions if she is missing client documents to "keep the clock moving a little faster." *Id.* Yet the Debtor had submitted all requested documents. Sandler never

filed a chapter 13 Plan, Statement of Financial Affairs, Summary of Assets and Liabilities, Form 122C-1, or Schedules A/B, C, D, E/F, G, H, I, J, among other required bankruptcy filings, including a disclosure of compensation as required by Bankruptcy Rule 2016(b).  *See* Debtor Ex. A; Hr'g at Min. 9:13–:41; 10:38:12–:38:37.

Sandler maintains that she did not file Schedules because she lacked information from the Debtor, *see* Hr'g at Min. 9:06:11–:17:18, but that assertion is contradicted by her own testimony and both parties' evidence, *see* Debtor Exs. A–L; Firm Exs. A–B; Hr'g at Min. 8:39–11:52. Sandler testified that she had copies of everything she needed to file the Debtor's Schedules by late December 2019 and stated in a February 2020 e-mail that the Schedules had been completed "some time ago."  Hr'g at Min. 9:12:10–:17:18; Debtor Ex. F.  She then testified that she did not file the Schedules because her laptop was stolen and she experienced health issues during the first weeks of the case.  *See* Hr'g at Min. 9:40–:46.  But Sandler also explained that she decided not to file documents and encouraged dismissal of the Debtor's case because she did not want the Debtor's "overly-aggressive creditors" to have his financial information and she believed that chapter 13 was not in his best interest.  *See* Hr'g at Min. 9:12:10–:17:18; Debtor Ex. F.

By the time of the Debtor's scheduled § 341 meeting of creditors on December 16, 2019, no Schedules or proposed Plan had been filed.  Sandler appeared at the meeting, but the Debtor did not.  Sandler represented to the chapter 13 trustee that her laptop had been stolen and that she was unable to file the Debtor's Schedules; therefore, the trustee rescheduled the § 341 meeting for January 6, 2020.  [ECF Doc. 35].   On January 6, 2020, neither Sandler nor the Debtor appeared for the rescheduled § 341 meeting and the *Trustee's Memo to Record* stated "not present, no plan, no pay."  [ECF Doc. 41].  As was revealed at the Hearing, the Debtor did not appear at either scheduled meeting of creditors because Sandler advised him not to attend.  *See* Hr'g at Min.

9:46:29–:48:25; 10:37:06–:37:49.   She testified that she thought his attendance would be an "exercise in futility," citing the lack of Schedules filed into the record for creditors' review, but also suggested that the Debtor was busy and she would "try to just handle it for him."   *See* Hr'g at Min. 9:46:29–:48:25.

Sandler testified that she was having difficulty proposing a feasible Plan because the Debtor's income decreased as creditors filed motions to confirm that the automatic stay did not apply to properties that were held by the Debtor's non-debtor businesses.   *See* Hr'g at Min. 9:42:18–:43:05.[3]   But the Debtor also held property in his own name.   On January 17, 2020, a secured lender filed a motion to lift the automatic stay on such property.   [ECF Doc. 47].   Sandler filed no response to that motion and the Court granted the motion on February 12, 2020.   [ECF Doc. 75].

---

[3]      One of those creditors was Hyde Park Plaza, L.L.C.  ("Hyde Park").  Hyde Park's Eviction Action had been filed on December 11, 2019.  Hyde Park is the owner of commercial property and sought to evict the Debtor's non-debtor affiliate, Innovative Fitness.  [ECF Doc. 32].  A hearing in that matter was scheduled to occur in state court on January 22, 2020.  As was learned at the Hearing on the Motion To Disgorge Fees, Michaud was retained on January 17, 2020, to represent Innovative Fitness in the Eviction Action.  *See* Hr'g at Min. 10:07–:09:16; 10:33:31–:33:47; Debtor Ex. K.

Sandler did not file an opposition to the motion filed by Hyde Park in this Court requesting confirmation that the automatic stay did not apply to Innovative Fitness's lease, which was considered by this Court on January 22, 2020.  [ECF Doc. 56].  But she did file a pleading in the Eviction Action in state court weeks before on December 9, 2019, entitled *Motion To Enforce Bankruptcy Stay*.  [ECF Doc. 32, Ex. D].  In that pleading, which attached Learson's *Notice of Bankruptcy Filing*, Sandler asserted without authority that the Debtor's personal guaranty on Innovative Fitness's lease transformed the lease into property of the Debtor's bankruptcy estate and, therefore, that lease was protected by § 362(a)'s automatic stay which prevented the progression of the Eviction Action.  *See id*.  Sandler further represented to the state court that

> Hyde Park Plaza LLC, through its counsel received notice of said bankruptcy, and they have failed to ask the bankruptcy court to lift the stay, to determine that a stay does not exist, or for that matter to make any appearance whatsoever, effectively violating the stay of that court by proceeding herein.

*See id*.  Based on Sandler's representations, the state court judge instructed Hyde Park to obtain guidance from this Court.  Hyde Park then filed its motion in this Court requesting confirmation that the automatic stay did not apply to the lease.  At the hearing on January 22, 2020, this Court cautioned Sandler regarding the lack of legitimacy of her argument and granted Hyde Park's motion.  [ECF Doc. 56].

3.  *The Trustee's motion to dismiss, creditors' lift-stay motions, and the Debtor's
    sale motions*

On January 14, 2020, the chapter 13 trustee filed a motion to dismiss the Debtor's case,

which was set to be considered on February 12, 2020, on the basis that the Debtor had failed to

(i) file Schedules or a proposed Plan, (ii) make any plan payments to the trustee, or (iii) attend a

§ 341 meeting.  [ECF Docs. 43 & 45].  At the end of January, the trustee amended his motion to

dismiss to include the basis that the total of unsecured claims that had been filed exceeded the

jurisdictional limit for chapter 13.  [ECF Doc. 64].  On January 24, 2020, before the hearing on

the trustee's amended motion to dismiss, Sandler filed on behalf of the Debtor a motion to sell two

properties purportedly belonging to the Debtor (the "Sale Motion") and asked for expedited review

of that Sale Motion.  [ECF Docs. 51 & 52].  Sandler represented in the Sale Motion that

> [a]s of date [*sic*], this Court has yet to confirm a Debtor plan of reorganization, and
> the debtor avers that he has not completed schedules and his plan because he has
> been working through significant documents with counsel to insure [*sic*] they are
> correct.  Further he avers these documents will be filed prior to the hearing of this
> matter.

Sale Motion, ¶ 3.  Sandler also represented in the motion to expedite the Sale Motion that one sale

was set to close that day and the other within five days, adding that both sales would be subject to

real estate broker commissions (for unidentified realtors that had yet to receive Court approval).

[ECF Doc. 52].  The Court denied the Debtor's request for expedited review.  [ECF Doc. 57].

Sandler responded by filing a motion to reconsider that Order, [ECF Doc. 59], which the Court

denied, [ECF Doc. 61].  On February 2, 2020, the Court issued an *Order To Show Cause*, ordering

the Debtor and Sandler to appear and show cause on February 12, 2020, as to why the case should

not be converted to one under chapter 7.  [ECF Doc. 65].

On February 10, 2020, the Debtor asked Sandler to withdraw from her representation in

his bankruptcy case, stating that he was "trying to protect my remaining assets so I do not loose

[*sic*] everything." *See* Debtor Ex. F. In her reply to his e-mail request, Sandler advised that "this case would be better dismissed," but admitted that "I completed your documents [for Schedules and a Plan] some time ago, but I told all involved that I didn't want to expose your financials to overly-aggressive creditors if this case wasn't going to benefit you." *Id*. Sandler deflected the Debtor's request to withdraw, stating that "I've got completed schedules and documents but the court will not just let me withdraw." *Id*.

On February 12, 2020, the Court held a hearing to consider, among other matters, the trustee's amended motion to dismiss, the Court's *Order To Show Cause*, and the Sale Motion. Sandler appeared at the hearing, but the Debtor did not. *See* Hr'g at Min. 9:54:48–10:04:28 (Feb. 12, 2020). No Schedules had been filed, although Sandler represented that they had been completed.[4] *See id*. Sandler pressed for approval of the Sale Motion or, in the alternative, dismissal of the case should the Sale Motion not be approved. *See id*. The Court observed the fact that creditors and the Court could not evaluate the merits of the Sale Motion without any participation in the bankruptcy process by the Debtor, *i.e.*, no Schedules, no proposed plan, no § 341 meetings. *See id*. The Court found that the utter lack of information and transparency provided by the Debtor, coupled with the Debtor's attempt to sell purported property of the estate on an expedited basis without the opportunity by the creditor body to vet the transactions, suggested that an independent trustee was warranted. *See id*. The Court denied the Sale Motion, denied the trustee's motion to dismiss, and converted the case to one under chapter 7. [ECF Doc. 76]; *see also* Memo to Record (entry 72).

---

[4] Sandler represented in open court that she had not filed the Debtor's Schedules yet because she "was waiting to see what would happen" with Hyde Park's motion. *See* Hr'g at Min. 9:54:48–10:04:28 (Feb. 12, 2020). But Hyde Park's motion had been granted on January 22, 2020. *See supra* note 3.

On March 1, 2020, the Court granted a motion to substitute attorney Kevin Gipson for Sandler to represent the Debtor. [ECF Doc. 92]. In early April 2020, Gipson filed Schedules, pay advices, and the chapter 7 means-test calculation form into the record on behalf of the Debtor and also filed a *Motion To Convert Case to Chapter 13*. [ECF Docs. 100–112]. The Debtor attended the chapter 7 meeting of creditors on April 25, 2020. [ECF Doc. 115]. Between May 2020 and the date of the Hearing on the Motion To Disgorge Fees, Gipson filed into the record on behalf of the Debtor (i) the Debtor's 2018 and 2019 tax documents, [ECF Docs. 121 & 122]; (ii) a motion to sell property of the Debtor, [ECF Doc. 132]; (iii) a motion to use funds, [ECF Doc. 133]; and (iv) a Plan and liquidation analysis, [ECF Docs. 143 & 145]. The Court issued an Order granting the Debtor's *Motion To Convert Case to Chapter 13* on September 29, 2020. [ECF Doc. 230].[5] After the Court approved a settlement among the parties in the adversary proceeding challenging the dischargeability of claims alleged in the Fraud Case, [ECF Doc. 308], the Court confirmed the Debtor's plan of reorganization on August 6, 2021, [ECF Doc. 328].

Gipson filed the Motion To Disgorge Fees in May 2020, seeking disgorgement of Sandler's fees, demanding disgorgement of all fees paid for services not rendered. [ECF Doc. 130].

---

[5]  Learson's initial Schedule E/F indicated his total unsecured debt is $829,476.96. [ECF Doc. 107]. On July 23, 2020, claimant Louisiana Department of Revenue withdrew its claim for $28,886.57, reducing Learson's total unsecured debt to $800,590.39. *See* Proof of Claim No. 6; [ECF Doc. 200]. At the hearing on the Debtor's motion to convert the case to chapter 13 held July 29, 2020, the Court determined the total noncontingent, liquidated, unsecured debt to be $420,819.76 after excluding disputed, unliquidated claims and a duplicative claim. *See* ECF Doc. 198; Hr'g at Min. 13:47:04–:48:34 (Jul. 29, 2020). In an Order signed on September 28, 2020, this Court disallowed a disputed claim, which reduced Learson's noncontingent, liquidated unsecured debt to $355,750.76, an amount below the jurisdictional debt limit imposed by 11 U.S.C. § 109(e). *See* Proof of Claim No. 10; [ECF Docs. 203 & 232]; Hr'g at Min. 13:15:57–:16:09 (Sept. 23, 2020).

## CONCLUSIONS OF LAW

### A.      Standard of Review of Attorney Compensation and Disgorgement of Fees

As bears repeating, "[t]here are few things which a bankruptcy court finds as distasteful as its duty to examine transactions between an attorney and a bankruptcy debtor or to evaluate the reasonableness and necessity of attorney's fees." *In re Mayeaux*, 569 B.R. 614, 620 (Bankr. E.D. Tex. 2001).  But the fulfillment of that duty is critical to the integrity of the bankruptcy process as "the debtor is in a vulnerable position and is highly dependent on its attorney and therefore will be reluctant to object to the fees of the attorney." *Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.)*, 210 B.R. 844, 848 (10th Cir. B.A.P. 1997).

The bankruptcy process starts with and depends on disclosure.   Section 329 of the Bankruptcy Code requires:

> Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

11 U.S.C. § 329(a).  Further, Bankruptcy Rule 2016 requires:

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity.  The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required.  A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

FED. R. BANKR. P. 2016(b).  The legislative history for § 329 notes that "[p]ayments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy

laws, and serious potential for overreaching by the debtor's attorney and should be subject to careful scrutiny." H.R. REP. NO. 95-595, at 329 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787.

In a chapter 13 case, an attorney need not obtain bankruptcy court approval to serve as debtor's counsel. "Thus, it is only by review of a [Bankruptcy Rule] 2016(b) statement of compensation that the Chapter 13 trustee, the court, or any interested party may be apprised of the debtor's intentions to pay counsel." *In re Ball*, No. 07-32628, 2011 WL 7748356, at *2 (Bankr. S.D. Tex. Sept. 23, 2011). "Under these circumstances, strict and timely compliance with the disclosure requirements set forth in § 329 and Rule 2016(b) is absolutely imperative in Chapter 13 cases." *Id*. (citing *In re Fricker*, 131 B.R. 932, 940 (Bankr. E.D. Pa. 1991)); *see also In re Mayeaux*, 269 B.R. at 627 ("[T]he policy requiring timely disclosure of . . . matters under § 329 and Rule 2016(b) is central to the integrity of the bankruptcy process and are not to be taken lightly nor easily dismissed . . . ." (citation omitted)). As further explained by Judge Jernigan in *In re Fair*:

> [T]his court cannot emphasize the importance of disclosing not only the amount of attorney's fees received, but also the source of such fees. Disclosure is what enables a bankruptcy court and parties to examine and identify potential issues with fees agreements before, or soon after, such agreements are actually consummated. Upon reviewing disclosures, the bankruptcy court may, where appropriate, order the return of compensation that exceeds the reasonable value of such services. Moreover, in reviewing fee arrangements, a bankruptcy court can ascertain potential conflicts of interest (either under the Bankruptcy Code—where applicable—or as set forth in the [State] Disciplinary Rules of Professional Conduct) and address any issues as necessary. Thus, disclosure enables a court to review not only whether the fee arrangement itself is reasonable in terms of value, but also whether the services provided by debtor's counsel were "untainted" by third-party influences.

No. 15-33400, 2016 WL 3027264, at *15 (Bankr. N.D. Tex. May 18, 2016) (citations omitted).

If an attorney's compensation is subject to disclosure under § 329(a) and Rule 2016(a), then § 329(b) and Bankruptcy Rule 2017 "authorize the Court to act upon that disclosure by

determining whether such payments were excessive and by ordering the return of all or any part of such payments." *In re Mayeaux*, 269 B.R. at 621.[6]  Indeed, "failure to timely provide a 2016(b) statement of compensation in compliance with § 329 constitutes independent grounds for ordering disgorgement of counsel's fees." *In re Ball*, 2011 WL 7748356, at *2 (citing *Wootten v. Ravkind (In re Dixon)*, 143 B.R. 671, 680 (Bankr. N.D. Tex. 1992)); *see also In re Stewart*, 970 F.3d 1255, 1268 (10th Cir. 2020); *Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis)*, 113 F.3d 1040, 1045–46 (9th Cir. 1997); *In re Downs*, 103 F.3d 472, 478 (6th Cir. 1996); *Arens v. Boughton (In re Prudhomme)*, 43 F.3d 1000, 1003 (5th Cir. 1995); *Futuronics Corp. v. Arutt, Nachamie & Benjamin (In re Futuronics Corp.)*, 655 F.2d 463, 470 (2d Cir. 1981).

In determining whether fees are excessive, "the Court is to be guided by § 330 which sets forth a number of factors that Congress found relevant to an assessment of the value of the services." *In re Gage*, 394 B.R. 184, 191 (Bankr. N.D. Ill. 2008) (citing *In re Wiredyne, Inc.*, 3 F.3d 1125, 1127 (7th Cir. 1993)); *see also In re Lewis*, 113 F.3d at 1045 ("An attorney's failure to obey the disclosure and reporting requirements of the Bankruptcy Code and Rules gives the

---

[6]     Section 329(b) states in pertinent part that "[i]f such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive . . . ."   Rule 2017 provides:

> (a) **Payment or Transfer to Attorney Before Order for Relief.**  On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive.

> (b) **Payment or Transfer to Attorney After Order for Relief.**  On motion by the debtor, the United States trustee or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property, or any agreement therefor, by the debtor to an attorney after entry of an order for relief in a case under the Code is excessive, whether the payment or transfer is made or is to be made directly or indirectly, if the payment, transfer, or agreement therefor is for services in any way related to the case.

bankruptcy court discretion to order disgorgement of attorney's fees. In reaching this conclusion, we do not mean to say that the excessiveness or reasonableness of those fees is irrelevant in all cases; in appropriate circumstances, a bankruptcy court should inquire into these subjects as part of deciding whether and to what extent to order disgorgement.").[7] "The Attorney carries the burden of showing that the compensation received was reasonable." *Brown v. Luker (In re Zepecki)*, 258 B.R. 719, 723 (8th Cir. B.A.P. 2001) (citations omitted).

Thus, "[t]aken together, § 329 and Rule 2017 furnish the court with express power to review payments to attorneys for excessiveness and to restore the status quo when assets have improvidently been bartered for legal services." *In re Mayeaux*, 269 B.R. at 621 (quoting *In re Campbell*, 259 B.R. 615, 626 (Bankr. N.D. Ohio 2001)); *see also In re Prudhomme*, 43 F.3d at 1002–03.

---

[7] Those factors include:

  (A) the time spent on such services;

  (B) the rates charged for such services;

  (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

  (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

  (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

  (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

**B.**    **Disgorgement of Excessive Fees Is Warranted Because the Firm Made No Disclosure of Fees for Services Rendered In Contemplation of or In Connection With the Debtor's Bankruptcy**

As discussed below, the evidence revealed that the Firm collected the following fees pre- and post-petition for services rendered "in contemplation of or in connection with" the Debtor's bankruptcy filing:

- $2,500 for defense of the Foreclosure Action

- $2,500 for filing and management of Learson's consumer bankruptcy case

- $4,000 for defense of the Fraud Case and prosecution of potential adversary proceedings

- $2,000 for defense of the Eviction Action

The Firm made no disclosure of those fees totaling $11,000.  Disgorgement of those fees is warranted for that fact alone.  For the following reasons, the Court also finds that the fees collected for the services rendered are excessive and orders disgorgements of those fees accordingly.

1. *The Firm must disgorge excessive fees made in contemplation of the Debtor's bankruptcy filing.*

"Section 329(a) is written in the disjunctive and most courts have interpreted the operative phrase—'in contemplation of or in connection with'—as incorporating two different concepts and have applied different standards under each sub-phrase." *In re Mayeaux*, 269 B.R. at 622 (citations omitted).  "A fee payment is made 'in contemplation of' a bankruptcy case if the underlying professional services were rendered at a time when the debtor was contemplating bankruptcy." *Id*. "The services should have more than a casual relationship to the bankruptcy proceedings." *In re Zepecki*, 258 B.R. at 724.  Applying § 329's provisions broadly, "[c]ourts apply a subjective test, looking to whether the debtor was influenced by the possibility or imminence of a bankruptcy proceeding in making the transfer, to determine whether attorneys' fees payments were made 'in contemplation' of bankruptcy." *Id*. (citing *In re Dixon*, 143 B.R. 671, 676 n.3).

On October 31, 2019, Learson paid $2,500 to Michaud, one attorney of the two-attorney Firm, to defend Bellus in the Foreclosure Action.[8]  Sandler testified regarding a meeting held with Gaudin and Learson at the Firm on November 4, 2019, to discuss the difficulty in obtaining an injunction hearing in state court on short notice and the possibility that, if Michaud could not obtain such a hearing, then Learson could file a consumer bankruptcy to stop the foreclosure sale under Sandler's theory that Learson was a "joint and solidary obligor" as the guarantor of the Bellus debt.  *See* Hr'g at Min. 9:51:29–:55:08.  On November 7, 2019—the day of the foreclosure sale— Sandler filed a consumer bankruptcy case on Learson's behalf.  *See* Hr'g at Min. 9:03:22–:05:17; 9:18:18–:20:51.  The insertion of Bellus's name on the petition resulted in Bellus's name appearing on Learson's *Notice of Bankruptcy Case Filing*, which improperly stopped the foreclosure sale because Bellus itself was not a debtor in bankruptcy.  *See* ECF Docs. 5 & 10.  Based upon the short period—one week—between the date Michaud was retained to defend against the Foreclosure Action and the date Sandler filed the Debtor's bankruptcy petition, *see* Debtor Exs. A & L, as well as Sandler's testimony regarding the meetings held during the week prior to the bankruptcy filing, *see* Hr'g at Min. 9:51:29–:55:08, the Court finds that the Debtor's interactions with the Firm were motivated by the possibility or imminence of bankruptcy.  Thus, Michaud was subject to § 329's and Rule 2016's disclosure requirements.[9]  The Firm made no disclosure of the $2,500 fee collected for defending the Foreclosure Action and disgorgement is warranted on that basis.

---

[8]     Although Learson executed a retention agreement with Michaud on behalf of Bellus, the evidence reveals that the Firm treated Learson as the client.  For example, the invoice for the costs for filing and serving pleadings to enjoin the Bellus foreclosure sale was identified as "Bill for Brandin."  Debtor Ex. J. Thus, the Court finds that, for purposes of § 329 and Rule 2017, the Firm rendered services to Learson.  *See In re Zepecki*, 258 B.R. at 724.

[9]     The fact that Michaud did not serve as bankruptcy counsel of record does not insulate him here from being subject to § 329's reporting requirements.  *See In re Zepecki*, 277 F.3d at 1046; *Garcia v. Miller (In re Garcia)*, 456 B.R. 361, 364 (N.D. Ill. 2011); *In re Dixon*, 143 B.R. at 677.  "The . . . emphasis on whether [an attorney] may be considered one of [the debtor's] bankruptcy counsel is not the appropriate test for determining whether an attorney is subject to the requirements of Section 329."  *In re Garcia*, 456

Disgorgement is allowed to the extent that the fees are excessive. *See* 11 U.S.C. § 329; FED. R. BANKR. P. 2017(a). The Court finds that the $2,500 fee collected by Michaud to defend the Foreclosure Action is excessive. The Firm offered no evidence regarding the reasonable value of those services and thus did not meet its burden to show that those limited prepetition services were of a value exceeding $2,500. The testimony from Sandler and the Debtor indicates that, during the one week that Michaud served as counsel to defend against the Foreclosure Action, he met with Learson and Gaudin and filed a pleading to enjoin the foreclosure sale. *See* Hr'g at Min. 9:51:29–:55:08; 10:32:22; 10:40:23–:42:23; Debtor Ex. J. The engagement lasted less than a week and resulted in the filing of a bankruptcy case, for which Learson was charged another $2,500. *See* Hr'g at Min. 9:51:29–:55:08; Debtor Exs. A & L. Based upon the very limited time spent defending the Foreclosure Action, the Court finds that $2,500 for that service to be excessive and orders disgorgement of that amount to the Debtor.

### 2. *The Firm must disgorge excessive fees made in connection with the Debtor's bankruptcy case*

"In consideration of whether the legal services rendered by the Debtor's counsel were 'in connection with' the bankruptcy case, a more objective standard applies." *In re Mayeaux*, 269 B.R. at 622. But "[t]he term 'in connection with the case' in § 329(a) is construed broadly." *In re Gorski*, 519 B.R. 67, 71 (Bankr. S.D.N.Y. 2014). "If it can be objectively determined that the services rendered or to be rendered by the attorney have or will have an impact on the bankruptcy case, then such services are deemed to have been rendered in connection with the bankruptcy case . . . ." *Id*. (citation omitted). "[C]ourts have concluded that the 'in connection with' phrase

---

B.R. at 365. "Instead, the court should determine whether [the attorney's] transactions with [the debtor] were for the purpose of avoiding bankruptcy or were motivated by the imminence of bankruptcy." *Id*.

means services that are inextricably intertwined with the bankruptcy or services that are crucial to the debtors' efforts to reorganize under Chapter 13." *Morris v. King (In re Rosales)*, 621 B.R. 903, 924 (Bankr. D. Kan. 2020) (citing *In re Keller Fin. Servs. of Fla., Inc.*, 248 B.R. 859, 879 (Bankr. M.D. Fla. 2000); *In re Frye*, 570 B.R. 21, 29 (Bankr. D. Vt. 2017)).

Here, the Firm collected $2,500 in fees prepetition for Sandler's representation of Learson in connection with the filing of his consumer bankruptcy case, as well as $4,000 in fees post-petition in connection with Michaud's defense of the Fraud Case in state court and prosecution of adversary proceedings anticipated to be filed in connection with Learson's bankruptcy case. *See* Debtor Exs. A & G. The Firm also collected $2,000 in fees post-petition for Michaud's representation of Learson's non-debtor affiliate, Innovative Fitness, to defend the Eviction Action. *See* Hr'g at Min. 10:05:20–:09:50; Debtor Ex. K. The question is whether those services had an impact on the bankruptcy case such that the Firm would be subjected to § 329's and Rule 2016's disclosure requirements. The Court finds that they did.

There is no question that Sandler is required to disclose her fee for filing and managing Learson's consumer bankruptcy case. And although the state court Fraud Case was stayed as to Learson when the Firm filed Learson's bankruptcy case on November 7, 2019, Michaud testified that, in exchange for the $4,000 fee, he filed pleadings in January 2020 to substitute as counsel for Learson, Gaudin, and Bellus in the Fraud Case and to ask for continuances of those proceedings. He also testified that the $4,000 fee was also to be used for filing adversary proceedings in Learson's bankruptcy case in order to tee up the claims asserted in the Fraud Case. *See* Hr'g at Min. 10:05:40–:08:03. The Court finds that the resolution of the claims against Learson in the Fraud Case, whether in state court or in this Court, would impact Learson's ability to propose a feasible plan of reorganization. As to Michaud's representation of Learson's closely held

company, Innovative Fitness, in the Eviction Action, the Court finds that resolution of the Eviction Action would likewise affect Learson's ability to earn income and fund a plan of reorganization, as Learson's income derived from the operation of his closely held businesses.  Given the broad application of § 329's phrase "in connection with," the Court finds that Michaud's post-petition representations of Learson in the Fraud Case and Learson's non-debtor affiliate, Innovative Fitness, are inextricably intertwined with the bankruptcy case, thus subjecting Michaud to the disclosure requirements of § 329 and Rule 2016.

Neither Sandler nor Michaud disclosed any of those fees collected prepetition or post-petition for services rendered in connection with Learson's bankruptcy case.  Thus, disgorgement is warranted.  Again, the Firm offered no evidence regarding the reasonable value of its services and thus did not meet its burden to show that those prepetition services were of a value exceeding $8,500.  The Firm has refunded $2,000 to the Debtor, acknowledging that no services were provided for filing or prosecuting adversary proceedings.  *See* Debtor Ex. I; Hr'g at Min. 10:06:23; 10:14:00–:15:40; *supra* note 2.  The record shows that Michaud's representation of Learson in the Fraud Case was very limited in scope, both in terms of duration and services provided.  The Court questions whether those services were necessary, as the Fraud Case was stayed as to Learson by operation of 11 U.S.C. § 362(a) once the Firm filed Learson's bankruptcy case on November 7, 2019.  Little evidence was offered regarding the services Michaud performed in the Eviction Action.  *See* Hr'g at Min. 10:08:54–:09:35; *supra* note 3.

Based upon the questionable necessity of defending the Fraud Case after the filing of Learson's bankruptcy petition and the limited services actually provided in the defense of the Fraud Case and the Eviction Action, the Court finds that $4,000 for Michaud's services to be excessive and orders disgorgement of that amount to the Debtor.

As to the remaining $2,500 that Sandler collected to file and manage Learson's bankruptcy case, the Court also finds that those fees are excessive. The record of this bankruptcy case reveals that Sandler's representation of the Debtor lasted approximately four months. But from the initial filing of the case, she consistently gave the Debtor advice and made decisions on his behalf that subjected his case to dismissal: She instructed the Debtor not to attend scheduled § 341 meetings; she refused to file Schedules although they were purportedly completed and claimed she was protecting the Debtor; and, although the Debtor never made Plan payments to the chapter 13 trustee during the months prior to conversion of the case, a proposed Plan was never filed identifying even an estimate for Plan payments. Sandler filed no response to the motion to terminate the automatic stay of the Debtor's property. She complained that she could not file a feasible Plan and stated that she advised the Debtor that chapter 13 was not in his interests, but Sandler never filed a motion to withdraw from the representation under Louisiana Rule of Professional Conduct 1.16 and Local Rule 2014-1—even when the Debtor requested that she withdraw. In short, Sandler failed to provide the basic services promised in the Fee Agreement.[10] Therefore, the Court orders disgorgement of $2,500 to the Debtor.

---

[10] The Court notes that the most concerning aspects of Sandler's representation in this case are the tactics used to advance a legal theory whereby the Debtor's personal guaranty of non-debtor loans transforms non-debtor property serving as collateral into property of the Debtor's estate subject to § 362(a)'s automatic stay. Bankruptcy Rule 9011 requires in pertinent part:

(b) **Representations to the Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleadings, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law . . . .

FED. R. BANKR. P. 9011(b). A modicum of legal research would have revealed whether Sandler's theory could hold water—it does not. But the question of whether any of Sandler's actions in this case violated

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the *Debtor's Motion for Order Compelling Disgorgement of Fees* is **GRANTED**;

**IT IS FURTHER ORDERED** that the law firm of Sandler Michaud, LLC shall disgorge $9,000 to the Debtor within fourteen days of this Order by mailing via commercial courier or hand-delivering certified funds to the Debtor's attorney, Kevin Gipson;

**IT IS FUTHER ORDERED** that all parties shall bear their own costs.

New Orleans, Louisiana, February 18, 2022.

_____

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

---

Rule 9011 is not before the Court. A motion for sanctions under Rule 9011 must be made by separate motion, and employs a burden-shifting evidentiary standard. *See In re KPMA P'ship, Ltd.*, No. 04-35261, 2006 WL 2868978, at *1 & n.1 (Bankr. S.D. Tex. Oct. 5, 2006). Rule 9011 motions are designed to protect the bankruptcy system as a whole by deterring improper filings, while the motion before the Court filed here under § 329 has the limited purpose of regulating the relationship between a debtor and the debtor's attorney. *See In re Petrovic*, 560 B.R. 312, 315–16 (Bankr. N.D. Ill. 2016) (citing cases).

In addition to its authority under Rule 9011(c) to issue sanctions for violation of Rule 9011(b), this Court also has inherent authority under § 105(a) of the Bankruptcy Court to sanction litigation abuses. *See In re Stomberg*, 487 B.R. 775, 817 (Bankr. S.D. Tex. 2013). Section 105 "does not exist to merely punish behavior already sanctioned by other mechanisms[;] [r]ather, § 105 is mean to 'fill in the interstices' that rules such as 9011(c) do not fill." *Id.* (quoting *Chambers v. Nasco, Inc.*, 501 U.S. 32, 46–47 (1991)). "[T]he imposition of sanctions using these inherent powers must be accompanied by a specific finding of bad faith." *Id.* (citing *Knight v. Luedtke (Matter of Yorkshire, LLC)*, 540 F.3d 328, 332 (5th Cir. 2008); *Goldin v. Bartholow*, 166 F.3d 710, 722 (5th Cir. 1999); *In re Paige*, 365 B.R. 632, 638 (Bankr. N.D. Tex. 2007)). At this time, the Court declines to make a finding here that Sandler acted in bad faith and impose additional sanctions other than those warranted under § 329.